**THE ANTOINE LAW FIRM, LLC**
Wilson D. Antoine, Esq.
NJ Bar Id#  027922008
52 Underwood Street, #1L
Newark, New Jersey 07106
Tel. (973) 370-5347
Fax. (908) 925-5021
Email: wilsona@antoinelawfirm.com
  *Attorney for Plaintiffs*
  *John Doe and*
  *Jane Doe, individually and*
  *as Guardian Ad Litem for N.D. and L.D.*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JOHN DOE, in his individual capacity; and JANE DOE, in her individual capacity and in her capacity as GUARDIAN *AD LITEM* FOR HER MINOR CHILDREN N.D. AND L.D.,**<br><br>            Plaintiffs,<br><br>            v.<br><br>**THE COLUMBIA GROUP AT HAMILTON PHASE II, LLC; EP MANAGEMENT, LLC A/K/A EDGEWOOD PROPERTIES; RONALD ROES 1-10; ABC CORPS. 1-10,**<br><br>            Defendants. | Civ. No. |

**COMPLAINT**

## TABLE OF CONTENTS

SUMMARY OF ACTION............................................... 4

PARTIES........................................................ 7

JURISDICTION AND VENUE......................................... 9

ALLEGATIONS COMMON TO ALL COUNTS............................... 9

  The Crossings at Hamilton Station Apartments ................. 9

  Plaintiffs Were Exemplary Tenants ......................... 11

  The Landlord Has a Demonstrated History of
  Discriminating/Retaliating Against Plaintiffs by Withholding
  and Delaying Services ..................................... 12

  The Landlord's Actions and Defalcations Resulted in a Toxic
  Mold Infestation in the Townhouse and Property Damage. ...... 16

  The Landlord Without Reason Maliciously Sought to Evict
  Plaintiffs. ............................................... 20

  The Landlord Irrevocably Damaged Plaintiffs' Personal Property
  and Illegally Withheld Amounts Due to Plaintiffs ............ 22

COUNT ONE (FHA, 42 U.S.C. § 3601 *et seq.*; as against all
Defendants)................................................... 24

COUNT TWO (NJLAD, N.J.S.A. § 10:5-1 *et seq.*; as against all
Defendants)................................................... 26

COUNT THREE (CFA, N.J.S.A. 56:8-1 *et seq.*; as against all
Defendants)................................................... 28

COUNT FOUR (Breach of Contract; as against Defendants EP,
Columbia, and Defendant Owners among Ronald Roes 1-10)........ 31

COUNT FIVE (Breach of Implied Covenants and Warranties; as
against Defendants EP, Columbia, and the Owners Among Ronald
Roes 1-10)................................................... 33

COUNT SIX (Tortious Interference; as against Fictitious
Defendants)................................................... 34

COUNT SEVEN (Promissory Estoppel; as against all Defendants).. 36

COUNT EIGHT (Unjust Enrichment; as against all Defendants).... 37

**COUNT NINE** (Anti-Reprisal Law, N.J.S.A. § 2A:42-10.10 *et seq*; as against all Defendants).................................... 38

**COUNT TEN** (Infliction of Emotional Distress; as against all Defendants)................................................. 40

**COUNT ELEVEN** (Fraudulent Concealment/Spoliation; as to all Defendants)................................................. 41

**COUNT TWELVE** (Negligent Spoliation; as to all Defendants)..... 43

**COUNT THIRTEEN** (Constructive Eviction; as against all Defendants)................................................. 46

**COUNT FOURTEEN** (Negligence; as against all Defendants)........ 47

**COUNT FIFTEEN** (Security Deposit Law, N.J.S.A. § 46:8-19 *et seq.*; as against all Defendants).................................... 48

**COUNT SIXTEEN** (Damage of Property in Violation of N.J.S.A. § 2A:18-72 *et seq.*; as against all Defendants).................. 50

**JURY DEMAND**............................................... 51

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**.............. 51

Plaintiffs John Doe and Jane Doe, individually and as Guardian *Ad Litem* for her minor children N.D. and L.D. ("Plaintiffs")[1], by and through the Antoine Law Firm, LLC, by way of Complaint against the defendants, the Columbia Group at Hamilton Phase II, LLC ("Columbia" or "Owner"), EP Management, LLC, also known as Edgewood Properties ("EP" or "Property Manager") (collectively the "Landlord"), Ronald Roes 1-10, and ABC Corps. 1-10 (collectively "Defendants"), state:

## SUMMARY OF ACTION

1.    This matter arises out of the wrongful retaliation, discrimination, and eviction proceedings initiated against Plaintiffs on account of their race and/or their complaints about the habitability of their rental unit.

2.    Plaintiffs fall into protected classes with respect to their race, ethnicity, and nationality as Jamaican-American dual-citizens of African descent (their children being only American citizens of Jamaican descent).

3.    Since at least 2019, the Landlord has continuously

---

[1] Plaintiffs are pleaded with pseudonyms (1) pursuant to Federal Rule of Civil Procedure 5.2 and Local Civil Rule of Procedure 5.2(17) because two of the Plaintiffs are minors; (2) because the severe reputational risk arising from this action could threaten employment status of Plaintiffs; (3) in conformity with the public and privacy interest, as reflected in N.J.S.A. § 2A:42-144 *et seq.* and New Jersey Court Rule 1:38-3, in maintaining the confidentiality of eviction proceedings against tenants, where no judgment of eviction is obtained.

violated Plaintiffs' rights in that the Landlord unlawfully harassed, discriminated and retaliated against, and misused civil process against the Doe Family, and willfully withheld services due to them under their lease, despite them being model tenants.

4.   Moreover, on a continuous basis from 2021 through 2022 the Landlord, among other things, continuously violated Plaintiffs' rights by

> (a)  subjecting them to uninhabitable and toxic living conditions;
>
> (b)  making numerous misrepresentations and concealing and destroying evidence to conceal the presence of mold in the rental unit and in Plaintiffs' personal property;
>
> (c)  constructively evicting Plaintiffs;
>
> (d)  frivolously initiating eviction proceedings after Plaintiffs vacated the uninhabitable rental unit;
>
> (e)  refusing to provide alternative accommodations;
>
> (f)  trying to limit Plaintiffs' ability to find permanent housing elsewhere by refusing to provide basic rental history to at least one prospective landlord;
>
> (g)  charging Plaintiffs for the term of a lease they did not sign and during the time when Plaintiffs were not living in the rental unit;

(h) charging Plaintiffs for the remediation of the toxic living conditions that the Landlord refused to fix during the lease term.

5. The Landlord's actions have

(a) violated the New Jersey Law Against Discrimination's ("NJLAD"), N.J.S.A. § 10:5-1 *et seq.*, and the Fair Housing Act's ("FHA"), 42 U.S.C. § 3601 *et seq.*, prohibition against discrimination and retaliation;

(b) violated the Anti-Reprisal Law, N.J.S.A. § 2A:42-10.10 *et seq.*, which prohibits the Landlord's initiation of retaliatory eviction proceedings against tenants for exercising their rights under a lease;

(c) violated the Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-1 *et seq.*, with respect to the Landlord's misrepresentations and concealment of material facts about the condition of the Townhouse and Plaintiffs' personal property, especially as to a mold infestation;

(d) violated N.J.S.A. § 2A:18-82, which provides double damages for wrongful destruction or damage to tenant property by reason of the Landlord's refusal to remediate the mold infestation in the rental

unit;

(e)   violated N.J.S.A. § 46:8-19 *et seq.,* by refusing to return Plaintiff's security deposit and purportedly applying the deposit to remedy the mold conditions that the Landlord refused to remedy during the lease term; and

(f)   engaged in illegal conduct under the common law, including constructive eviction, breach of contract, fraud, and/or negligence by reason of the Landlord's fraudulent and/or negligent concealment and misrepresentations and delays of service with respect to a toxic mold infestation in the rental unit and its effect on Plaintiffs' health and personal property.

### PARTIES

6.   Plaintiff John Doe is a natural person, and a dual American and Jamaican citizen of African descent, the husband of Plaintiff Jane Doe, and the father of minors N.D. and L.D.

7.   Plaintiff Jane Doe is a natural person, and a dual American and Jamaican citizen of African descent, the wife of Plaintiff John Doe, and the mother of minors N.D. and L.D. Plaintiff Jane Doe consents to act as guardian ad litem for minors N.D. and L.D., and there is no conflict of interest between parent and child.

8.     Plaintiff N.D. is a natural person and a United States citizen of six years of age of African and Caribbean descent, a minor, and the child of Plaintiffs Jane and John Doe.

9.     Plaintiff L.D. is a natural person and a United States citizen of 3 years of age of African and Caribbean descent, a minor, and the child of Plaintiffs Jane and John Doe.

10.    Columbia is a New Jersey For-Profit Limited Liability Company formed on March 4, 2015, with a principal place of business at 1260 Stelton Road Piscataway, NJ 08854.

11.    EP is a New Jersey For-Profit Limited Liability Company formed on March 7, 1996, with a registered business address at 1260 Stelton Road, Piscataway, NJ 08854.

12.    ABC Corps. 1-10 are fictitious unnamed companies that are affiliated with EP, Columbia, and/or each other, and/or are the parent companies and/or subsidiaries of one or more of the named defendants, and/or independent fictitious unnamed companies that caused, abetted, aided in, or contributed to Plaintiffs' damages and injuries.

13.    Ronald Roes 1-10 are fictitious unnamed persons, employed by, managing, and/or affiliated with the named Defendants, and/or independent fictitious unnamed persons that caused, abetted, aided in, or contributed to Plaintiffs' damages and injuries.

## JURISDICTION AND VENUE

14. This action arises, in part out of the violations of the FHA (42 U.S.C. § 3601 *et seq.*), and subject matter jurisdiction is therefore conferred on this Court by 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

15. Supplemental jurisdiction over the related state law claims is conferred on this Court by 28 U.S.C. § 1367(a).

16. All Defendants reside in this District. Furthermore, Defendants are subject to the Court's personal jurisdiction with respect to this action as they are all residents of New Jersey within this District. Accordingly, venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Crossings at Hamilton Station Apartments

17. On information and belief, the Ronald Roes 1-10, insofar as they are owners of the Landlord, have used the corporate forms of EP and Columbia and other companies, including ABC Corps. 1-10, to perpetrate a fraud on potential creditors and tenants.

18. Columbia owns the apartment complex named The Crossings at Hamilton Station Apartments (the "Complex"), the underlying premises (the "Premises"), and the rental unit therein at 9 Adirondack Blvd, Hamilton, New Jersey (the "Townhouse").

19. EP is the Property Manager and developer for the Complex.

20.   On information and belief, at all times relevant, the owners among Ronald Roes 1-10, have dominated EP and Columbia; EP and Columbia have dominated each other; or the one company dominated the other, such that there was no separate existence between them and their owners.

21.   Rather, the one company was merely a conduit and alter ego for the other and for their owners.

22.   On information and belief, at all times relevant, EP and Columbia were grossly undercapitalized, operated daily with a failure to observe corporate formalities, were insolvent, lacked corporate records, and/or one of the companies was merely a façade for the other.

23.   On information and belief, the two companies share not only an address, but employees, phone numbers, emails, and other capital.

24.   The two companies should therefore be treated as one entity, the Landlord, with one company the alter ego of the other, and both companies liable for each other's actions and omissions.

25.   Likewise, the corporate veil should be pierced as to owners among Ronald Roes 1-10, such that they are both liable for the actions and omissions of their shell companies against the tenants of the Complex, particularly Plaintiffs.

26.   On information and belief, the Complex is composed of approximately 636 apartments, all of which are available for rent

to the public.

27.  The Complex has a common clubhouse, swimming pool, fitness center, courtyards, walking paths, and parking.

**Plaintiffs Were Exemplary Tenants**

28.  Plaintiffs have been dutiful and responsible tenants of Columbia since November 18, 2017.

29.  For the 53 months that Plaintiffs resided at the Townhouse, they have always paid their rent on time without fail (except for one delayed payment, due to the COVID-19 pandemic, which tardiness was waived by the Landlord).

30.  Plaintiffs have adhered to all terms of all applicable leases (collectively the "Lease") with the Landlord and have been friendly neighbors to other residents.

31.  Even when Plaintiffs were constructively evicted from their Townhouse as a result of the Landlord's breach of the Lease and tortious activities, Plaintiffs still gave prompt notice that they had vacated the premises, and they paid advanced rent to the Landlord for the following month despite the Townhouse being uninhabitable and despite Plaintiffs having to pay for alternate housing elsewhere.

**The Landlord Has a Demonstrated History of
Discriminating/Retaliating Against Plaintiffs by Withholding and
Delaying Services**

32.  As stated above, on or about November 18, 2017, Plaintiffs moved into the Townhouse.

33.  Only a few days after moving into the Townhouse, Plaintiffs found that the toilets in both the master bedroom and powder room were defective, and there was an infestation of roaches in the Townhouse.

34.  While these two issues were promptly addressed, it appears that Plaintiffs' exercise of their rights prompted the Landlord to retaliate by delaying and/or denying further requests for services.

35.  In particular, the defective powder room toilet continued to be a problem over the next several years, constantly becoming unflushable or clogged.

36.  The Landlord merely responded that the toilet paper being used was too thick, and the Landlord refused Plaintiffs' requests to replace the toilet.

37.  After repeated complaints, the Landlord finally replaced the powder room toilet in September 2020.  Thereafter, no major issues were experienced with that toilet.

38.  In August 2019, the Landlord maliciously allocated Plaintiffs' rent payment to another resident and harassed and threatened Plaintiffs with legal action for purportedly not paying

rent.

39.  Even after Plaintiffs had a Bank of America representative speak directly with the Landlord, the Landlord refused to stop harassing Plaintiffs for rent.

40.  It was only after it became clear that Plaintiffs would not back down and pay double rent or vacate the premises, that the Landlord relented and represented that Plaintiffs' rent check had been improperly credited to another tenant's account.

41.  In November 2019, Plaintiffs' car was damaged overnight while parked in its customary spot, immediately in front of the Townhouse and next to the Landlord's sales office.

42.  There are visible surveillance cameras covering the area where the car was parked.

43.  Plaintiffs requested help to investigate the crime, including asking the Landlord to review surveillance cameras and reach out to other residents for information.

44.  The Landlord denied all of Plaintiffs' pleas for help.

45.  Thereafter, when Plaintiffs renewed the Lease in 2020, conditioned on a $500.00 refund due at signing, the Landlord delayed payment of the promised $500.00 refund for 8 months until August 13, 2020.

46.  Said refund was only provided after repeated requests for the same.

47.  On February 2, 2021, the Landlord's snow removal crew

maliciously scraped snow from the road and created a mountain of snow in front of Mr. Doe's car, effectively trapping the vehicle in its location.

48. After Mr. Doe complained, the Landlord relented and sent an elderly maintenance technician to remove the snow that the Landlord's agents had placed in front of the vehicle.

49. A year later, on February 1, 2022, the Landlord expressly told the snow removers not to remove snow from Plaintiffs' walkway and driveway.

50. The result was that every unit had their snow removed except for that of Plaintiffs.

51. Mr. Doe had to trudge through several blocks of snow to track down and plead with the snow removers so that they could ignore the Landlord's request and clear snow from his Townhouse.

52. The Landlord has a demonstrated history of discriminating against tenants who exercise their rights to the Landlord's annoyance, including tenants who exercise their rights to vacate.

53. In this respect, online reviews of the Landlord are replete with complaints that at the time tenants vacate the Premises, the Landlord will send inspectors who have already filled out an inspection sheet without doing an inspection, so that the Landlord can fraudulently claim to be entitled to exhaust the entire security deposit.

54.   On information and belief, when it came to minority tenants, including tenants of African, Indian, and Caribbean decent, the Landlord would frequently (1) fail to respond to maintenance requests; (2) delay response to maintenance requests; (3) fail to give notice prior to entering residential units; and (4) call tenants once at times when the Landlord knew or should have known that tenants were unavailable and close the request maintenance after a single attempt to set up a repair date.

55.   This string of actions shows a prejudice toward Plaintiffs, and similarly-situated tenants in protected classes, which had not been displayed to any other tenants in the Townhouse complex outside of those protected classes.

56.   Personally, during their stay at the Complex, Plaintiff were aware of an interracial couple (one Caucasian and one African-American) who would receive prompt responses and better services when the Caucasian partner called into the Landlord's office.

57.   Likewise, in conversations between Plaintiffs and their neighbors, they learned that a nearby Indian couple on the same block had similar issues with snow-removal, while a Caucasian tenants advised that he had no issue with the management practices of the Landlord.

58.   Nevertheless, the worst breach of the rights of Plaintiffs was made on a continuing basis between January 2021 and June 2022.

**The Landlord's Actions and Defalcations Resulted in a Toxic Mold Infestation in the Townhouse and Property Damage.**

59.   On March 9, 2021, Plaintiffs reported possible mold and that, when it rained, the air vent in the master bathroom would leak.

60.   The Landlord advised that the leak was from the roof, and although a technician was able to spray the mold and clean vents on March 11, the Landlord advised that it would take longer to find a vendor for the roof.

61.   Accordingly, the leaks resumed from the bathroom ceiling, and Plaintiffs again reported matter on May 30, 2021.

62.   Nevertheless, a representative of EP, on behalf of and in concert with Columbia, misrepresented that the issue had been resolved and misrepresented that someone would be sent to re-paint the bathroom ceiling.

63.   No one was ever sent.

64.   The leaking roof continued to be a problem, and additional complaints were sent on June 2, 2021.

65.   On June 29, 2021, Plaintiffs became aware of another water leak under the kitchen sink (unrelated to leak in the master bathroom), which had completely soaked the cupboard and the floor under the sink.

66.   The Landlord was promptly notified, and although the Landlord fixed the leak, the Landlord covered the wet cupboard

under the kitchen sink rather than replacing it.

67. Plaintiffs expressed their concerns about this action to the Landlord, but those concerns went unanswered.

68. On July 8, 2021, Plaintiffs followed up about remediation of the bathroom ceiling to have it re-painted at a minimum.

69. On October 28, 2021, in the heart of the COVID-19 pandemic and despite the issues with the leaking roof, the Landlord sent Plaintiffs a lease renewal with an 18% rent increase, effective March 18, 2022.

70. Despite Plaintiffs' ongoing requests to have the roof fixed, the leaking roof of the master bathroom was not addressed until on or about December 28, 2021.

71. The Landlord promised to "fix the drywall and paint where the leak was." No such remediation was done.

72. By January 3, 2022, the affected areas had again begun to show visible mold growth.

73. Although the re-painting was subsequently done, Plaintiffs would later learn that the drywall and mold issues had never been addressed.

74. In particular, the Landlord included a Mold Addendum in a lease renewal package falsely claiming that the Townhouse was inspected and found to contain no mold.

75. As a result, Plaintiffs engaged a nationally recognized

environmental testing company to test the Townhouse for mold. The test included, among other things, the following:

- Visual inspection: found suspect visible mold growth on master bath walls and ceiling.

- Air sampling: found poor air quality throughout the Townhouse including high concentrations of toxic mold (including Aspergillus/Penicillium and Chaetomium, the latter associated with water-damaged homes). From the results, the environmental hygienist suspected that there was a leak somewhere on the first floor, consistent with a leak from the kitchen sink.

- Bacteria sampling: found 143 million CFUs (or ~14,000 times level considered high level for residential environment).

- Endotoxin analysis: found 298 EU/mL (or ~150 times expected maximum levels).

- EPA sampling: identified a number of different mold species by quantitative PCR.

76. In reviewing the findings with Plaintiffs, the environmental hygienist, among other things, advised that their personal belongings were also contaminated with these harmful substances and that belongings taken with them could contaminate their next residence.

77.   Additionally, Plaintiffs were asked to be extremely cautious given the young children in the family.

78.   Plaintiffs promptly notified the Landlord and provided contact information for the environmental hygienist.

79.   Plaintiffs (that day and in subsequent days) requested alternative accommodations numerous times, but the Landlord ignored their pleas.

80.   This forced Plaintiffs to vacate the Townhouse on March 25, 2022.

81.   Nevertheless, Plaintiffs paid one month in advance at the increased rent price.

82.   The Landlord was advised of the vacating of the Townhouse, and the Landlord scheduled an appointment to inspect the Townhouse on March 26 which discovered that the Townhouse was indeed contaminated.

83.   The Landlord thereafter asked its personnel to limit communications with Plaintiffs.

84.   Additionally, the Landlord refused to verify basic rental history for at least one prospective landlord on April 28, 2022.

85.   The Landlord's refusal frustrated the efforts of Plaintiffs who desperately sought to find alternative housing.

86.   Notably, the Landlord's obstinacy forced Plaintiffs to relocate to three temporary locations after vacating the Townhouse

on March 25, 2022.

87.   As a result of the mold infestation and the contamination of their personal property, Plaintiffs were forced to abandon their personal property.

88.   Because the leak prevailed for so long with no proper attention by the Landlord, Plaintiffs' rental insurance refused to cover the damage to Plaintiffs' property.

89.   The Landlord refused to reimburse Plaintiffs for the contamination that the Landlord caused to their personal property.

90.   The family is still undergoing testing to identify the extent of the harm caused by the mold infestation.  Initial tests indicated high levels of mold in bodily fluids, which on information and belief match mold found in the environmental assessment.

**The Landlord Without Reason Maliciously Sought to Evict Plaintiffs.**

91.   To add insult to injury, and even though the Landlord was aware that Plaintiffs were no longer residing in the Townhouse, the Landlord commenced eviction proceedings against Plaintiffs and attempted to collect rent for the period following Plaintiffs' constructive eviction from the Townhouse.

92.   The eviction proceedings were both procedurally and substantively frivolous.

93.   They were procedurally frivolous because no proper

notice of eviction had been sent.

94.   They were substantively frivolous because Plaintiffs had already vacated the Townhouse and given notice to the Landlord.

95.   Notwithstanding    the    foregoing,    the    Landlord misrepresented to the Court that Plaintiffs were still occupying the Townhouse.

96.   Plaintiffs repeatedly reached out to the Landlord about the frivolity of the eviction proceedings to no avail.

97.   On information and belief, the owners among Ronald Roes 1-10, were aware of Plaintiffs' pleas to the Landlord, and those owners consented and agreed to perpetrate the frivolous and retaliatory eviction proceedings against Plaintiffs.

98.   While Plaintiffs were trying to settle into their new home and to seek medical attention, the Landlord's frivolous eviction proceedings compelled Plaintiffs to retain two separate attorneys to protect their rights.

99.   Moreover, the filing of the eviction proceedings has already caused reputational harm to Plaintiffs.

100. Plaintiff John Doe was required to undergo the embarrassment of proactively providing notice of the eviction proceedings to the compliance division at his job. Plaintiff John Doe was required to provide this information because of the nature of the industry in which he works.

101. Furthermore, Mr. Doe was required to engage an attorney

to assess any adverse consequences of the eviction proceedings to his then-pending application for U.S. citizenship.

102. Mr. Doe had previously endured the embarrassment of notifying his boss and team members about the mold issue to explain numerous unplanned absences from his new job and change from business attire; notably, he had started the job only two weeks earlier, on March 14, 2022.

103. Eventually the Landlord withdrew the eviction proceedings, falsely representing to the court that Plaintiffs had vacated in June 2022.

### The Landlord Irrevocably Damaged Plaintiffs' Personal Property and Illegally Withheld Amounts Due to Plaintiffs

104. Following the withdrawal of the eviction proceedings and in or about July 2022, Plaintiffs gave the Landlord notice that they were awaiting return of their security deposit along with interest, in conformity with N.J.S.A. § 46:8-19 *et seq.*, as well as the refund of $400 annual amenity fee (paid on April 1, 2022) and of advanced rent paid after they had vacated the Townhouse in March 2022.

105. To date, none of those amounts have been refunded.

106. To the contrary, the Landlord sent a fraudulent account statement, claiming that Plaintiffs vacated the premises on May 28, 2022, exhausting the security deposit with fees that were charged after Plaintiffs vacated the Townhouse, charging

Plaintiffs for the cost of remediating the mold and other issues that the Landlord refused to fix during Plaintiffs' tenancy, and requesting that Plaintiffs pay an additional $5,842.12.

107. In a separate correspondence sent by the Landlord's law firm, Weingarten Law, the Landlord directed Plaintiffs to reclaim their irrevocably contaminated personal property.

108. In response, Plaintiffs notified the Landlord of their duty to preserve that personal property as evidence relating to the degree of contamination.

109. The Landlord moved the personal property to a storage facility, and the Landlord promised to cooperate with Plaintiffs to reinspect the personal property for contamination.

110. However, on the date of inspection, all items were sealed in bags, and the Landlord refused to make those personal items sufficiently accessible to enable the proper testing of that personal property.

111. On information and belief, thereafter, the Landlord sold the contaminated personal property for a profit, and the Landlord failed to conduct tests to preserve evidence relating to the level of contamination of that personal property.

## COUNT ONE
(FHA, 42 U.S.C. § 3601 *et seq.*; as against all Defendants)

112. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

113. Plaintiffs are of African and Caribbean descent and the parents are of Caribbean nationality.

114. At all times relevant, Defendants have known of Plaintiffs' race, ethnicity, and nationality.

115. Defendants have discriminated and retaliated against Plaintiffs through harassment, delay and failure to provide performance and repairs, refusal to provide alternative accommodations, initiation of frivolous eviction proceedings, refusal to provide information to other prospective landlords, allowing the propagation of a mold infestation, limitations of privileges and services of facilities of the Complex, and use of different qualifications and calculations to make additional charges of Plaintiffs including charging Plaintiffs for the cost of remediating the mold after Plaintiffs' constructive eviction.

116. On information and belief, Defendants were motivated to retaliate and discriminate against Plaintiffs specifically because of their African and/or Caribbean heritage and/or Jamaican nationality.

117. On information and belief, the former tenants

complaining of similar mistreatment on various websites, were all minorities of at least African and Indian descent.

118. On information and belief, these acts of discrimination and retaliation were not perpetrated against non-minority tenants and families.

119. The principals and upper management of Defendants, including the owners among Ronald Roes 1-10, and ABC Corps. 1-10, knew of the above-referenced acts of discrimination and retaliation, and willfully, intentionally, and maliciously participated, aided, abetted, and encouraged those acts.

120. As a result of Defendants' intentional actions and deliberate indifference, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

      (a)  Compensatory damages;

      (b)  Consequential damages;

      (c)  Pain and Suffering damages;

      (d)  Emotional Distress damages;

      (e)  Reputational damages;

      (f)  Interest;

      (g)  Punitive damages;

      (h)  Attorneys' fees and costs of suit; and

      (i)  Such other relief as the Court may deem just and appropriate.

### COUNT TWO
(NJLAD, N.J.S.A. § 10:5-1 *et seq.*; as against all Defendants)

121. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

122. Plaintiffs are of African and Caribbean descent.

123. At all times relevant, Defendants have known of Plaintiffs' race, ethnicity, and nationality.

124. Defendants have discriminated and retaliated against Plaintiffs through harassment, delay and failure to provide performance and repairs, refusal to provide alternative accommodations, initiation of frivolous eviction proceedings, refusal to provide information to other prospective landlords, allowing the propagation of a mold infestation, limitations of privileges and services of facilities of the Complex, and use of different qualifications and calculations to make additional charges of Plaintiffs including charging Plaintiffs for the cost of remediating the mold after Plaintiffs' constructive eviction.

125. On information and belief, Defendants were motivated to retaliate and discriminate against Plaintiffs specifically because of their African and/or Caribbean heritage and/or Jamaican nationality, and/or because Plaintiffs attempted to exercise their rights under the Lease.

126. On information and belief, the former tenants

complaining of similar mistreatment on various websites, were all minorities of at least African and Indian descent.

127. On information and belief, these acts of discrimination and retaliation were not perpetrated against non-minority tenants and families.

128. The principals and upper management of Defendants, including the owners among Ronald Roes 1-10, and ABC Corps. 1-10, knew of the above-referenced acts of discrimination and retaliation, and willfully, intentionally, and maliciously participated, aided, abetted, and encouraged those acts.

129. As a result of Defendants' intentional actions and deliberate indifference, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

(a)   Compensatory damages;

(b)   Consequential damages;

(c)   Pain and Suffering damages;

(d)   Emotional Distress damages;

(e)   Reputational damages;

(f)   Interest;

(g)   Punitive damages;

(h)   Attorneys' fees and costs of suit; and

(i)   Such other relief as the Court may deem just and appropriate.

## COUNT THREE
(CFA, N.J.S.A. 56:8-1 *et seq.*; as against all Defendants)

130. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

131. Defendants knew that their negligence, recklessness or deliberate indifference had resulted in a severe and pervasive toxic mold infestation in the Townhouse.

132. Defendants knew that they had taken no steps to remediate the mold infestation or its underlying cause.

133. As set forth above in detail, Plaintiffs relied on Defendants' representations and continued to stay in the Townhouse until the infestation manifested to a degree that it was no longer deniable.

134. Even then, Defendants attempted to misrepresent that the mold infestation had been remediated and tried to manipulate Plaintiffs into waiving the right to dispute the existence of mold.

135. In reliance upon Defendants' statement that they had inspected and remedied the mold infestation, Plaintiffs were required to incur the cost of hiring a professional to assess the quality of this purported remediation.

136. The inspection revealed that no remediation had been performed and that the purported inspection was wholly a fraudulent misrepresentation.

137. On account of the delay, Plaintiffs' personal property was irrevocably contaminated, and they were subjected to infection by the mold.

138. Defendants knew and intended that Plaintiffs rely on their conduct and representations to Plaintiffs' detriment.

139. Defendants knew that mold infestations would be harmful to Plaintiffs, particularly their minor children.

140. Yet, they misrepresented and/or concealed their intention to remediate the mold.

141. Defendants also misrepresented that Plaintiffs had remained in the Townhouse long after they vacated, and Defendants initiated a frivolous eviction proceeding on this basis and attempted to charge Plaintiffs additional rent on the basis of this misrepresentation.

142. Plaintiffs were compelled to retain attorneys for legal advice on how to deal with this matter.

143. To make matters worse, during a New Jersey State of Emergency, the Landlord increased the rent by approximately 18%, effectively engaging in price gouging in violation of State executive orders and the CFA, N.J.S.A. §§ 56:8-107 56:8-109, which prohibit excessive price increases of over 10% during or within 30 days of the end of a state of emergency.

144. Defendants then misrepresented their remediation of mold, after Plaintiffs' departure, as being clean up fees required

of Plaintiffs.

145. As aforestated, Defendants conspired to engage in the above-referenced "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, [and] the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, . . . ." N.J.S.A. § 56:8-2.

146. Defendants' services and rental space constitute merchandise under the Consumer Fraud Act, and their communications and other documents disseminated to Plaintiffs constitute advertisements under N.J.S.A. § 56:8-1.

147. As a result of Defendants' actions, Plaintiffs have suffered ascertainable losses and damages in the form of attorneys' fees, lost personal property, lost security deposit and advanced rental payment, and other costs to respond to Defendants' misrepresentations and wrongful eviction proceedings.

**WHEREFORE**, Plaintiffs demand judgment jointly and severally against Defendants for:

       (a)   Treble damages;

       (b)   Emotional Distress damages;

       (c)   Interest;

       (d)   Disgorgement of Defendants' profits;

       (e)   Declaratory relief;

(f)   Punitive damages;

(g)   Attorneys' fees and costs of suit; and

(h)   Such other relief as the Court may deem just and appropriate.

### COUNT FOUR

(Breach of Contract; as against Defendants EP, Columbia, and Defendant Owners among Ronald Roes 1-10)

148. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

149. Plaintiffs entered into the Lease with Defendants EP and Columbia, the Landlord.

150. Paragraph 6(o) of the Lease states that if Plaintiffs are successful in any action or summary proceeding arising out of the lease, they are entitled to attorney's fees and expenses.

151. The Landlord breached the Lease by failing to remediate the mold infestation, making the Townhouse uninhabitable.

152. The Landlord additionally breached the Lease by withholding and delaying services and privileges due thereunder.

153. The Landlord withdrew the eviction proceedings because the Landlord knew that there was no reasonable basis therefore but have not tendered Plaintiffs' their attorneys' fees and costs.

154. The Landlord's material breaches of the Lease have also resulted in the contamination and loss of Plaintiffs' personal property.

155. The Landlord has also failed to return Plaintiffs'

security deposit and annual amenity fee.

156. The Landlord has also failed to return the advance paid for rent during the period when Plaintiffs had already vacated the premises.

157. The Landlord also breached the Lease by bringing a frivolous eviction proceeding, in and of itself.

158. The Landlord further breached the Lease by withholding and delaying services and amenities due thereunder.

159. The Landlord's misrepresentation of Plaintiffs' occupation of the Townhouse and the charges on Plaintiffs vacating the Townhouse constitute a breach of the Lease.

160. Moreover, the Landlord breached the Lease by enforcing the remaining duration of an unsigned written lease extension, when Plaintiffs were then subject to a month-to-month tenancy on the prior terms of the Lease or had still not completed the prior Lease term.

161. As a result of the Landlord's breaches, Plaintiffs have suffered and will continue to suffer damages.

162. As stated above, the corporate veil should be pierced as to the owners among Defendants Ronald Roes 1-10, making them personally liable for these breaches.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants EP, Columbia, the owners among Ronald Roes 1-10 for:

(a)   Compensatory damages;

(b)   Consequential damages;

(c)   Interest;

(d)   Punitive damages;

(e)   Attorneys' fees and costs of suit; and

(f)   Such other relief as the Court may deem just and appropriate.

## COUNT FIVE

(Breach of Implied Covenants and Warranties; as against Defendants EP, Columbia, and the Owners Among Ronald Roes 1-10)

163. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

164. In the alternative, the Landlord's aforementioned failures and breaches constitute a breach of the implied covenant of good faith and fair dealing, along with other implied warranties, including but not limited to the warranty of habitability and the warranty of quiet enjoyment.

165. As a result of the Landlord's conduct, Plaintiffs have suffered and will continue to suffer damages.

166. As stated above, the corporate veil should be pierced as to the owners among Defendants Ronald Roes 1-10, making them personally liable for these breaches.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants EP, Columbia, and the owners among Ronald Roes 1-10 for:

(a)   Compensatory damages;

(b)   Consequential damages;

(c)   Interest;

(d)   Punitive damages;

(e)   Attorneys' fees and costs of suit; and

(f)   Such other relief as the Court may deem just and appropriate.

## COUNT SIX

(Tortious Interference; as against Fictitious Defendants)

167. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

168. Ronald Roes 1-10, and ABC Corps. 1-10, including the owners of all corporate Defendants, knew of and intentionally and tortiously interfered with Plaintiffs' Lease with the named the Landlord.

169. In particular, on information and belief, the fictitious Defendants interfered with Plaintiffs' Lease with the Landlord by causing and/or inducing the Landlord to breach that Lease and/or carrying out and effecting the Landlord's intent to break the Lease.

170. The fictitious defendants interfered with the Lease by erecting requirements and barriers to bargained for services and privileges, directing that those services and privileges be withheld or delayed, sending fraudulent notices, including a

notice to quit, and effecting a wrongful eviction proceeding.

171. The fictitious Defendants tortiously interfered with Plaintiffs' prospective economic advantage by engaging in the above-referenced harassing acts with knowledge that it would harm and adversely affect Plaintiffs' reputations as tenants, and adversely affect their performance at work and thus prospective economic advantages from work.

172. The fictitious Defendants conspired together, or one convinced the others to assist in breaching the Lease and interfering with Plaintiffs' economic advantage so that they could profit from Plaintiffs' full payments under the Lease, while denying them the full benefits of the Lease.

173. As a result of the conduct of the fictitious Defendants, Plaintiffs have suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against the fictitious Defendants for:

(a)  Compensatory damages;

(b)  Consequential damages;

(c)  Pain and Suffering damages;

(d)  Emotional Distress damages;

(e)  Reputational damages;

(f)  Interest;

(g)  Punitive damages;

(h)  Attorneys' fees and costs of suit; and

(i)  Such other relief as the Court may deem just and appropriate.

## COUNT SEVEN
(Promissory Estoppel; as against all Defendants)

174. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

175. Alternatively, Defendants through word, deed and action, as set forth above, promised to not interfere with Plaintiffs' enjoyment of the Complex, and promised to allow them full use of all services, amenities, and privileges.

176. Plaintiffs relied on Defendants' promises, actions, representations and the parties' course of conduct, in renewing the Lease and paying the monthly rent.

177. Defendants used these promises to induce Plaintiffs to remain in the Lease and continue paying rent.

178. By the actions and misconduct described above, Defendants violated the above-referenced representations and course of conduct to deprive Plaintiffs of resources, funds, and time, as stated in more detail above.

179. Plaintiffs have been damaged by reason of Defendants' breach of their promises.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

(a)  Compensatory damages;

    (b)   Consequential damages;

    (c)   Interest;

    (d)   Punitive damages;

    (e)   Attorneys' fees and costs of suit; and

    (f)   Such other relief as the Court may deem just and appropriate.

<u>**COUNT EIGHT**</u>
(Unjust Enrichment; as against all Defendants)

180. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

181. Alternatively, Defendants have been unjustly enriched by wrongfully retaining and withholding monies due to Plaintiffs by reason of the wrongful eviction proceedings they initiated and the misrepresentation of charges exacted in the wake of Plaintiffs' constructive eviction.

182. Defendants have also been unjustly enriched by reason of funds that they have not earned and should have returned to Plaintiffs at the time that Plaintiffs vacated the Townhouse.

183. Plaintiffs did not intend any of these funds as a gift, and Defendants have suffered no harm or damages on account of Plaintiffs that would justify Defendants retaining these funds at law or in equity.

184. As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

(a)   Compensatory damages;

(b)   Consequential damages;

(c)   Interest;

(d)   Constructive Trust;

(e)   Punitive damages;

(f)   Attorneys' fees and costs of suit; and

(g)   Such other relief as the Court may deem just and appropriate.

### COUNT NINE
(Anti-Reprisal Law, N.J.S.A. § 2A:42-10.10 *et seq*;
as against all Defendants)

185. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

186. At all times relevant, Plaintiffs have been the Landlord's tenants at the Complex.

187. The Landlord instituted wrongful eviction proceedings against Plaintiffs as a reprisal for the tenants' efforts to secure and/or enforce their rights under the Lease and the laws of the State of New Jersey, its governmental subdivisions, and the United States as set forth above, including their complaints about the infestations, water leaks, snow removal services, and other breaches of the Lease.

188.  The Landlord knew that the eviction proceeding and

related notices were frivolous.

189. Alternatively, the Landlord failed to serve any of the notices required for eviction.

190. Accordingly, the Landlord ceased prosecuting the claims against Plaintiffs before the Landlord could be penalized with a judgment of dismissal.

191. The fictitious defendants aided, abetted, encouraged, and conspired with the named Defendants to bring frivolous eviction proceedings against Plaintiffs.

192. Alternatively, the corporate veil should be pierced as to the owners among Defendants Ronald Roes 1-10, making them personally liable for perpetuating retaliatory eviction proceedings against Plaintiffs.

193. Plaintiffs contacted the Landlord to cease and desist their frivolous action.

194. Defendants ignored Plaintiffs' pleas.

195. As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

        (a)   Compensatory damages;

        (b)   Consequential damages;

        (c)   Constructive Trust;

        (d)   Declaratory Judgment;

(e)   Interest;

(f)   Punitive damages;

(g)   Attorneys' fees and costs of suit; and

(h)   Such other relief as the Court may deem just and appropriate.

## COUNT TEN
(Infliction of Emotional Distress; as against all Defendants)

196. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

197. Defendants deliberately, intentionally, recklessly, or negligently brought a wrongful eviction proceeding against, and allowed mold to propagate in the Townhouse of, Plaintiffs with the knowledge and/or intention that they would suffer severe, genuine emotional distress.

198. As a direct result of Defendants' actions, Plaintiffs suffered severe, genuine emotional distress.

199. Defendants' actions in harassing, discriminating against, retaliating against, exposing toxic mold to, and bringing wrongful eviction proceedings against Plaintiffs, without just cause and over Plaintiffs' warnings and protestations, was extreme and outrageous.

200. Defendants intended, knew, believed in a high degree of probability, or should have known that their conduct would cause

severe and genuine emotional distress to Plaintiffs that no reasonable person could be expected to endure.

201. As a direct, but for, and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

a.   Compensatory damages;

b.   Consequential damages;

c.   Pain and Suffering damages;

d.   Emotional Distress damages;

e.   Reputational damages;

f.   Interest;

g.   Punitive damages;

h.   Attorneys' fees and costs of suit; and

i.   Such other relief as the Court may deem just and appropriate.

### COUNT ELEVEN
(Fraudulent Concealment/Spoliation; as to all Defendants)

202. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

203. On or about July 1, 2022, Plaintiffs sent Defendants a notice to preserve evidence, and affirmed their intention to bring a lawsuit arising out of Defendants' malfeasance.

204. On or about August 3, 2022, Defendants sent a letter acknowledging receipt of the notice of Defendants' duty to preserve evidence and Defendants' legal obligation to ultimately produce evidence in a subsequent action.

205. In fact, Defendants initially appeared to cooperate with Plaintiffs in allowing for a follow-up inspection of the level of contamination of Plaintiffs' personal property.

206. However, on the date of inspection, little to no materials were actually made available for inspection by a mold expert, as the personal property had been sealed in bags stacked on top of each other, and Defendants refused to take any action to make them available for proper inspection.

207. On February 20, 2022, Plaintiffs again advised Defendants of their notice to preserve evidence, related to the contamination of Plaintiffs' property.

208. On information and belief, Defendants disposed of the personal property and took no steps to preserve any evidence through either photos or tests.

209. Plaintiffs cannot reasonably obtain access to this evidence from any other source.

210. Notwithstanding that Defendants were aware of this information, and notwithstanding that they represented an intention to preserve all information, Defendants on information and belief have destroyed evidence.

211. Defendants intentionally destroyed the evidence with the purpose of disrupting the imminent litigation to be brought by Plaintiffs.

212. As a direct result of Defendants' destruction of evidence, Plaintiffs are damaged by having to rely on an evidential record that does not contain the material evidence that Defendants have destroyed, concerning the residual contamination and thus destruction of Plaintiffs' personal property.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

      (a)  Compensatory damages;

      (b)  Consequential damages;

      (c)  An Adverse Inference;

      (d)  Interest;

      (e)  Punitive damages;

      (f)  Attorneys' fees and costs of suit; and

      (g)  Such other relief as the Court may deem just and appropriate.

### COUNT TWELVE
(Negligent Spoliation; as to all Defendants)

213. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

214. On or about July 1, 2022, Plaintiffs sent Defendants a notice to preserve evidence, and affirmed their intention to bring a lawsuit arising out of Defendants' malfeasance.

215. On or about August 3, 2022, Defendants sent a letter acknowledging receipt of the notice of Defendants' duty to preserve evidence and Defendants' legal obligation to ultimately produce evidence in a subsequent action.

216. In fact, Defendants initially appeared to cooperate with Plaintiffs in allowing for a follow up inspection of the level of contamination of Plaintiffs' personal property.

217. However, on the date of inspection, little to no materials were actually made available for inspection by a mold expert, as the personal property had been sealed in bags stacked on top of each other, and Defendants refused to take any action to make them available for proper inspection.

218. On February 20, 2022, Plaintiffs again advised Defendants of their notice to preserve evidence, related to the contamination of Plaintiffs' property.

219. On information and belief, Defendants disposed of the personal property and took no steps to preserve any evidence through either photos or tests.

220. Defendants negligently concealed material information from Plaintiffs by destroying Plaintiffs' personal property

44

without preserving evidential information through pictures and tests.

221. Defendants knew or should have known that the above information would be material to Plaintiffs and this action, and Defendants had a duty to preserve and ultimately disclose that information.

222. Defendants knew, or reasonably should have known, that their destruction of evidence would disrupt the imminent litigation to be brought by Plaintiffs.

223. As a but-for, proximate and legal result of Defendants' spoliation of evidence, Plaintiffs have been damaged by having to rely on an evidential record that does not contain the material evidence that Defendants have destroyed.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

> (a)  Compensatory damages;
>
> (b)  Consequential damages;
>
> (c)  An Adverse Inference;
>
> (d)  Interest;
>
> (e)  Attorneys' fees and costs of suit; and
>
> (f)  Such other relief as the Court may deem just and appropriate.

**COUNT THIRTEEN**
(Constructive Eviction; as against all Defendants)

224. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

225. Defendants refused to timely address water leaks affecting the Townhouse.

226. As a result, toxic mold formed in the Townhouse, Plaintiffs informed Defendants of this issue.

227. Defendants refused to remedy the toxic mold infestation.

228. That infestation made the Townhouse uninhabitable and a health hazard.

229. In fact, Plaintiffs' minor children tested positive for a mold infection, from the high levels of exposure.

230. Defendants' breach of the covenant of habitability substantially interfered with Plaintiffs' use and enjoyment of the Townhouse, justifying their departure therefrom.

231. Plaintiffs' departure was also made within a reasonable time after the conditions arose, particularly given Defendants' attempts to conceal the condition and misrepresent the extent to which the condition had been remediated.

232. As result of Defendants' constructive eviction, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally,

against Defendants for:

      (a)   Compensatory damages;

      (b)   Consequential damages;

      (c)   Rent Refund;

      (d)   Interest;

      (e)   Attorneys' fees and costs of suit; and

      (f)   Such other relief as the Court may deem just and appropriate.

**COUNT FOURTEEN**
(Negligence; as against all Defendants)

233. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

234. Defendants owed a duty to Plaintiffs as the owner and manager of the Complex to keep the premises safe for invitees, such as Plaintiffs.

235. Defendants breached this duty by failing to remediate the mold infestation in the Townhouse, making it uninhabitable.

236. Defendants knew or should have known that the failure to timely remediate water leaks, and subsequently to timely remediate the mold would result in a proliferation of toxic mold, hazardous to Plaintiffs.

237. Defendants breach of their duty also resulted in the contamination and loss of Plaintiffs' personal property.

238. On information and belief, the exposure to toxic mold

has resulted in adverse health effects to Plaintiffs.

239. These damages were foreseeable.

240. As a but-for, proximate and legal result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

> (a)  Compensatory damages;
>
> (b)  Consequential damages;
>
> (c)  Pain and Suffering damages;
>
> (d)  Interest;
>
> (e)  Attorneys' fees and costs of suit; and
>
> (f)  Such other relief as the Court may deem just and appropriate.

### COUNT FIFTEEN
(Security Deposit Law, N.J.S.A. § 46:8-19 *et seq.*; as against all Defendants)

241. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

242. At all times relevant to this matter, Defendants have managed and accepted security deposits for more than 10 rental units at a time.

243. On information and belief, Plaintiffs' security deposit was not properly invested as required by N.J.S.A. § 46:8-19.

244. On information and belief, Defendants did not make the appropriate provisions to secure the interest on the security deposit to which Plaintiffs were entitled.

245. Defendants did not notify Plaintiffs in writing of the type of account in which the security deposit was placed, or the interest for that account on a regular basis.

246. Defendants never returned Plaintiffs' security deposit, notwithstanding a demand for the same on July 1, 2022, all in violation of N.J.S.A. § 46:8-21.1.

247. In fact, Defendant manufactured a fraudulent reason for withholding the security deposit, as they have done with countless minority tenants in the past.

248. As a result of Defendants' failure to return Plaintiffs' security deposit, Plaintiffs have suffered and will continue to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

      (a)  Double damages;

      (b)  Constructive Trust;

      (c)  Disgorgement of Profits;

      (d)  Interest;

      (e)  Attorneys' fees and costs of suit; and

      (f)  Such other relief as the Court may deem just and appropriate.

**COUNT SIXTEEN**

(Damage of Property in Violation of N.J.S.A. § 2A:18-72 *et seq.*;
as against all Defendants)

249. Plaintiffs repeat and reallege all of the factual allegations in the Complaint as if set forth in their entirety herein.

250. On account of Defendants' failure to timely remediate the mold infestation in the Townhouse, Plaintiffs' personal property was irrevocably contaminated and thus legally destroyed.

251. No prior notice was given before Defendants took actions that effectively destroyed and interfered with Plaintiffs' enjoyment and control of their personal property.

252. Even the subsequent notice of intent to dispose of abandoned property was not sent within the time period required by statute.

253. As a result of Defendants' destruction of Plaintiffs' personal property, Plaintiffs have suffered damages.

**WHEREFORE**, Plaintiffs demand judgment, jointly and severally, against Defendants for:

(a)  Double damages;

(b)  Constructive Trust;

(c)  Disgorgement of Profits;

(d)  Interest;

(e)  Attorneys' fees and costs of suit; and

(f)  Such other relief as the Court may deem just and appropriate.

                                    **THE ANTOINE LAW FIRM, LLC**
                                    Attorney for Plaintiff

                                    By:  s/Wilson D. Antoine
                                         Wilson D. Antoine, Esq.
                                         Managing Partner

Dated:  April 20, 2023


                              **JURY DEMAND**

     Plaintiffs hereby demand a trial by jury as to all issues
so triable.


                                    By:  s/Wilson D. Antoine
                                         Wilson D. Antoine, Esq.
                                         Managing Partner

 Dated:  April 20, 2023


              **CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2**

     I hereby certify that the matter in controversy is not the
subject of any other action or proceeding pending in any Court, or
in any pending arbitration or administrative proceeding.

     I certify under penalty of perjury that the foregoing is true
and correct to the best of my knowledge and belief.

                                    **THE ANTOINE LAW FIRM, LLC**
                                    Attorney for Plaintiff

                                    By:  s/Wilson D. Antoine
                                         Wilson D. Antoine, Esq.
                                         Managing Partner

Dated: April 20, 2023